[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The Morgans come before this court in a limited contested dissolution proceeding involving their marriage which occurred on July 25, 1970 at Elmhurst, Illinois. The plaintiff resided continuously in the state of Connecticut for at least twelve months preceding the filing of the complaint. Both children born to the plaintiff during the marriage have now reached the age of majority. Neither party has received aid from the State of Connecticut.
Both parties are 46 years old. They met in seventh grade and married three years after graduation from high school in the summer preceding the husband's senior year at Yale. Their first child was born in June of the following year.
The wife's education consists of a high school diploma plus approximately two years of college credits. The husband has an undergraduate degree from Yale University, a master's degree in special education, an advanced diploma in educational administration and a few courses toward his Ph.D.
Both parties were employed throughout the marriage. Initially, the wife worked for minimum wage at a grocery store in New Haven then became a customer service representative with the phone company. She left this job as then required by company policy, in her seventh month of pregnancy, in the spring of 1971. She remained unemployed until after the birth of the parties' second son. After that, she worked periodically at various entry level jobs including nursing homes, McDonalds, and taking surveys, working off hours so that babysitters weren't needed, to obtain funds for specific purposes such as appliances, vacations or purchasing a house. In the fall of 1978, when their youngest child started first grade. Mrs. Morgan began part-time employment with Grand Union, cashing checks in the office. Around 1980, she began working full-time. In the spring of 1981, she began approximately one year of training in Grand Union's management program. Thereafter, she worked in managerial positions with CT Page 12605 Grand Union until 1987 when she left for personal and work related reasons. In her position as manager, Mrs. Morgan supervised 40 to 60 employees and was responsible for store expense control, inventory control, customer service control, dealing with customer complaints, keeping the store clean and in good shape, general trouble shooting and producing a bottom line profit. As a manager, she was required to work every Friday night as well as alternating Saturdays and Sundays. When she left in 1987, she was earning approximately $50,000 per year.
After a brief period of employment handling the food aspects of the Wilton school system, in the spring of 1988, she accepted employment with Marcus Dairy where she remains today running their computer system, earning $14.40 per hour, with additional benefits including health insurance, vacation and sick time. Her current annual income is approximately $30,000.
The defendant called Mr. Andrew Faitak, a district sales manager at Grand Union, to testify as to available work in the industry for one of Mrs. Morgan's qualifications. Mr. Faitak was familiar with and thought highly of Mrs. Morgan's experience and skills as a store manager. Despite his high opinion of Mrs. Morgan, when asked if Grand Union would be willing to hire her back if there were a store manager's position available he testified that he was sure she would be considered, but did not know if she would be hired back at that level, having been away for eight years, suggesting that lesser jobs such as department manager or bookkeeper would be more likely options for her. This witness also testified to Mrs. Morgan's reasons for leaving Grand Union which included the difficult demands of the position as store manager and a desire at that time to change careers. The court does not find that the evidence supports a finding of the defendant's claimed earning capacity for Mrs. Morgan in the $50,000 to $60,000 range as a store manager. Although the evidence indicates other more immediately viable options such as bookkeeper or department manager, no evidence was presented regarding the compensation levels in those fields. Accordingly, the court finds Mrs. Morgan's income to be that which she is currently generating in her present employment after approximately seven years.
Mr. Morgan had a bursar's job while he was completing his last year at Yale. He began teaching the September following his graduation and also commenced his course work toward his master's degree. In approximately 1974, he took a different teaching job CT Page 12606 and began working on his 6th year degree in administration. He also coached Yale basketball, during this time period, for four seasons. His next position was assistant principal in New Fairfield, then assistant superintendent in Pocanipo Hills, then Farmington until he was recruited by his present employer, Southern Westchester B.O.C.E.S. where he has remained for approximately, ten years. Mr. Morgan coordinates staff development programs for schools and school districts throughout a region and conducts workshops, seminars, training sessions and in service courses for teachers and educational administrations. He receives a salary plus compensatory time at this employment. His current contract, expiring June 30, 1995, provides an annual salary of $93,300.
Mr. Morgan supplemented his employment income with consulting work which provided profits of almost $34,000 in 1994, over $39,000 in 1993, over $26,000 in 1992, almost $20,000 in 1991, over $12,000 in 1990, over $6,000 in 1989 and over $10,000 in 1988. He provided these consultation services for schools and school districts outside of his B.O.C.E.S. job responsibility, conducting seminars and workshops and advising administrators and principals on instructional methods, practices and curriculum development. Most of his referrals, for this consulting work, were based on his reputation. The defendant claims to have given up this additional lucrative source of income citing his health, quality of life and increased demands of his primary job. He claims that his prior stress related health problems have been eliminated due to the cessation of the consulting work. The court does not find his testimony in this regard to be credible and therefore finds his minimal earning capacity to be $93,000.
The personal history of this marriage is sadder than most. Mr. Morgan began having sexual relations with other women in the first three years of his marriage, some of which he disclosed to his wife at the time. He admits to five such individuals through approximately 1988. He also admits to "eight to ten" other instances of suggestive personal contact with other women. In August of 1992, the parties began marriage counseling. They separated in mid-October while still continuing in counseling. In early December of 1992, Mr. Morgan divulged more of his past sexual indiscretions to Mrs. Morgan, while also informing her of the relationship he'd been having for almost a year with a Ms. Spedafino, a co-worker at Southern Westchester B.O.C.E.S., who had also been a participant in some of his consulting projects. He indicated that they had travelled together and invested in a CT Page 12607 business together. At the end of this day of confessions, Mr. Morgan indicated that he wanted to try to put their marriage back together and later called to have Mrs. Morgan spend the evening/night with him at his house to discuss their future.
Mr. Morgan testified at trial that neither the beginning, middle nor last years of his marriage were any good. He says he went through the motions in going to the marriage counselling sessions. The revelations he made in December of 1992, he describes as a sort of "healing" in conjunction with his therapy. He concedes that he is primarily responsible for the breakdown of the marriage because he was never committed to the relationship. He cites Mrs. Morgan's contribution to the breakdown in her willingness to live the life they lived and the fact that she would have allowed it to continue. In discussing why he remained in the marriage since 1970, he cites his commitment to his children and fear of the unknown alternative. Mrs. Morgan considered leaving after her husband's disclosure of his sexual infidelities early in the marriage but had no viable alternatives as a mother with young children and little more than minimum wage earning capacity. The evidence leads to the conclusion that the defendant is primarily at fault for the breakdown of this marriage and the court so finds. The court further finds that the defendant's "healing" disclosure of the double life he had been living throughout the marriage as well as the fact that he now perceives himself to be in a comfortable, open and satisfying living arrangement with Ms. Spedafino, to be factors which have contributed to reduce the stress related health problems he previously experienced.
In determining the proper orders in this case, the court must consider the factors set forth in § 46b-81 and § 46b-82
of the General Statutes together with the provisions of §46b-62. With respect to alimony and a division of the property of the parties, the law to be considered has been stated as follows:
 To begin with, our alimony statute does not recognize an absolute right to alimony, General Statutes § 46b-82; Thomas v. Thomas, 159 Conn. 477, 486, 271 A.2d 62 (1970); `This court has reiterated time and again that awards of financial settlement ancillary to a marital dissolution rest in the sound discretion of the trial court.' [Citation omitted.] Although the court is required to consider the statutory criteria of length of marriage, causes for dissolution, the age, health, . . . income, CT Page 12608 assets and opportunity for future acquisition[s] of assets of each of the parties, [citation omitted], no single criterion is preferred over all the others. In weighing the factors in a given case, the court is not required to give equal weight to each of the specified items. Nevertheless, it is rather obvious that in making financial determinations, the financial circumstances, both actual and potential, are entitled to great weight.
Valante v. Valante, 180 Conn. 528, 530, 531 (1980); Watson v.Watson, 221 Conn. 698, 710 (1992).
The court has considered all of the criteria of §§ 46b-81
and 46b-82 of the General Statutes together with the provisions of § 46b-62 and all of the evidence and the case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken in to account," Scherr v. Scherr, 183 Conn. 366, 368
(1981), this court will not recount those statutory criteria and the evidence, other than as has been previously stated. "The court is not obligated to make express findings on each of these statutory criteria." Weiman v. Weiman, 188 Conn. 232, 234 (1982). Suffice to say that the court must consider all the statutory criteria in determining how to divide the parties' property in a dissolution proceeding, Leo v. Leo, 197 Conn. 1, 5 (1985), and that the court need not give equal weight to each factor. Kane v.Parry, 24 Conn. App. 307, 313-14 (1991).
The court, in addition to the foregoing findings, finds as follows:
1. There is the requisite jurisdiction.
2. The allegations of the complaint are proven and true.
3. There has been an irretrievable breakdown of the marriage and there is no prospect of reconciliation.
4. The husband's educational training and background are far superior to that of the wife.
5. The wife contributed both financially and non-monetarily to the husband's attainment of his educational accomplishments and the establishment of the husband's career. CT Page 12609
6. The parties contributed jointly to the acquisition and preservations of their assets.
7. The husband's opportunity to acquire assets in the future is greater than that of the wife.
8. The husband has greater opportunities to supplement his primary source of income from his regular employment due to his background, training, areas of expertise and reputation in his field and consulting experience.
9. The husband's earning capacity is substantially greater than that of the wife even if she were to choose to and be able to reobtain and maintain the demanding position of a store manager after her long absence from that field.
Based upon all of the foregoing, the court enters the following orders:
1. A decree of dissolution of the marriage shall enter on the grounds of irretrievable breakdown.
2. The funds held in escrow from the sale of the marital residence shall be divided seventy-five (75%) percent to the wife and twenty-five (25%) to the husband. The parties shall equally be responsible for and pay any capital gains tax due on the sale of the property and each shall indemnify and hold the other party harmless from any liability regarding his or her respective share of such tax.
3. The amounts in the wife's 401K, the wife's IRA, the husband's SEP account and the husband's IRA shall be added together and the wife shall be entitled to sixty-five (65%) percent of that total amount. To effectuate this division, the wife shall retain her IRA and 401K accounts and a Qualified Domestic Relations Order shall enter transferring to the wife from the husband's IRA and/or SEP account an amount which when added to the value of her IRA and 401K accounts equals sixty-five (65%) percent of the total of those four accounts.
4. The husband shall transfer to the wife any right, title and interest in the 1993 Saturn vehicle. The wife shall be responsible for the payment of the loan thereon.
5. The husband shall be entitled to the $3,250 balance in the CT Page 12610 Franklin money fund, the Chemical Bank savings and checking and the Portchester Credit Union.
6. The Equitable Tax Sheltered Annuity shall be divided sixty-five (65%) percent to the wife and thirty-five (35%) percent to the husband and a Qualified Domestic Relations Order shall enter transferring to the wife her share of this account.
7. The Travelers Tax Sheltered Annuity shall be divided sixty-five (65%) percent to the wife and thirty-five (35%) percent to the husband and a Qualified Domestic Relations Order shall enter transferring to the wife her share of this account.
8. The wife is awarded fifty (50%) percent of the husband's pension and/or retirement benefits accrued through the date of the dissolution of the marriage, including any service retirement allowance and deferred retirement allowance and a Qualified Domestic Relations Order shall enter transferring to the wife her share in such benefits.
9. The husband shall during his lifetime pay to the wife during her lifetime or her remarriage the sum of $24,000 annually as alimony payable monthly at the rate of $2,000 per month. These payments shall be due and payable on or before the 15th day of each month commencing November 15, 1995.
10. The husband shall maintain the existing life insurance policies in the face amounts reflected on his financial affidavit dated May 3, 1995 and shall designate the wife as the sole beneficiary of same for so long as he is obligated to pay alimony to the wife. The husband shall make no changes or substitutions in said policies without the written agreement of the wife or order of a court of competent jurisdiction. The husband shall provide verification that such policies are in full force and effect no less than one time per year. In the event the husband fails to maintain such insurance, the wife shall have a claim against the husband's estate for the face amounts reflected on the May 3, 1995 affidavit.
11. All other personal property which is currently in the possession of each party shall remain the property of such party.
12. The court has considered the division of assets pursuant to this decision and accordingly orders that each party shall be responsible for the payment of his or her respective counsel CT Page 12611 fees.
13. The court shall retain jurisdiction over the division of the parties' assets including the Qualified Domestic Relations Orders made pursuant to this decision until all orders are fully effectuated in accordance with this decision.
14. Each party shall be responsible for the debts reflected on his or her respective financial affidavit.
Dennis, J.